IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

               Plaintiff,

v.

DARRELL LYNN SNYDER,

               Defendant.

CR 04-115-BR
(CV 05-1093-BR)

CR 00-371-BR
(CV 05-1094-BR)

CR 00-547-BR
(CV 05-1095-BR)

OPINION AND ORDER

**KARIN J. IMMERGUT**
United States Attorney
**LESLIE K. BAKER**
Assistant United States Attorney
701 High Street
Eugene, OR  97401
(541) 465-6903

        Attorneys for Plaintiff

**DARRELL LYNN SNYDER**
#63992-065
Taft Correctional Institution
P.O. Box 7001
Taft, CA 93268-7001

        Defendant, *Pro Se*

1  -  OPINION AND ORDER

**BROWN, Judge.**

These matters come before the Court on Defendant Darrell Lynn Snyder's Amended Motions to Vacate or to Correct Sentence Under § 2255 (#23) in CR 04-115-BR (CV 05-1093-BR), (#65) in CR 00-371-BR (CV 05-1094-BR), and (#65) in CR 00-547-BR (CV 05-1095-BR).  In these Motions, Snyder seeks relief from the 235-month concurrent prison terms he is serving as the result of his guilty pleas to drug and money-laundering charges pursuant to a global Plea Agreement with the government in these and other matters.

For the reasons that follow, the Court concludes there is not any need for an evidentiary hearing nor a basis to provide Snyder any relief under § 2255.  The Court, therefore, **DENIES** each of the Amended Motions in each of the enumerated cases and **DISMISSES** each of these matters **with prejudice**.


<u>BACKGROUND</u>

A.    <u>The April 19, 2004, Change-of-Plea Hearing</u>.

On April 19, 2004, following a lengthy plea colloquy with Snyder pursuant to Federal Rule of Criminal Procedure 11, this Court accepted Snyder's guilty pleas to, and found Snyder guilty of, the following:

    1.    CR 00-371, Count 1 (as amended) of the Indictment returned in the Southern District of Texas, Brownsville

Division that originally charged Snyder and co-defendants with conspiracy to import "one thousand kilograms or more of a mixture or substance containing a detectable amount of marihuana, a Schedule I, Controlled Substance and five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II, Controlled Substance" in violation of 21 U.S.C. §§ 952(a), 960(b)(1)(A), and 963, and that was transferred with Snyder's consent to the District of Oregon pursuant to Fed. R. Crim. P. 20 where the charging language was amended by stipulation of the parties to delete any references to marijuana as against Snyder.

2.  CR 00-547, Count 1 of the Indictment returned in the District of Oregon that charged Snyder with money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) and § 2.

3.  CR 04-115, the sole count in the Indictment originally returned in the Eastern District of Arkansas that charged Snyder with possession with intent to distribute approximately 24 kilograms of cocaine in violation of 21 U.S.C. § 841.  Snyder also was transferred with his consent to the District of Oregon pursuant to Fed. R. Crim. P. 20.

Snyder tendered his guilty pleas in written Plea Petitions pursuant to various Plea Agreement documents as follows:

1.  A global written plea offer from Assistant United States Attorney for the District of Oregon Leslie K. Baker dated December 10, 2003, that includes Snyder's April 18, 2004, signature signifying his acceptance of the offer;

2.  A February 2, 2004, letter addendum to the December 10, 2003, Plea Agreement that Snyder signed on March 4, 2004; and

3.  An additional Plea Agreement prepared by the Arkansas prosecutor that Snyder signed on April 19, 2004, to resolve the Arkansas Indictment.

These Plea Agreements represented a global resolution of all pending and potential additional charges against Snyder and were reached after negotiations over a significant period of time among prosecutors from the three judicial districts, Snyder, and Ernest Warren, Jr., Snyder's trial counsel.

In exchange for Snyder's guilty pleas, the government agreed to provide Snyder with various concessions such as dismissal of several pending charges, avoidance of additional prosecutions, and certain sentencing recommendations for a more lenient sentence than might be warranted otherwise if the cases were prosecuted to convictions in the three jurisdictions, including

4  -  OPINION AND ORDER

an agreed one-level downward departure based on the savings of substantial government and judicial resources.

In addition to pleading guilty as specified, Snyder also agreed to "waive any appeal rights in connection with these cases" and to waive "the right to file a motion pursuant to 28 U.S.C. § 2255 to set aside the conviction and sentence, except on grounds of ineffective assistance of counsel, newly discovered evidence, or a retroactive change in the applicable guidelines or statute."

The change-of-plea hearing in these matters took place on April 19, 2004, before the Supreme Court decided *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court sentenced Snyder on September 1, 2004, which was before the Supreme Court decided *United States v. Booker*, 125 S. Ct. 738 (2005).

In *Blakely*, the Supreme Court held any contested sentencing factor that enhances a defendant's sentence above the ordinarily-applicable, then-mandatory Sentencing Guideline range must be proven to a jury beyond a reasonable doubt and could not be determined by a judge as permitted under the United States Sentencing Guidelines. In *Booker*, the Supreme Court held the Sentencing Guidelines were advisory only, and, accordingly, a judge was permitted to find facts necessary to apply the Sentencing Guidelines even though those facts were not charged in the indictment.

5  -  OPINION AND ORDER

At the time of the plea colloquy with Snyder, this Court proceeded with an understanding that the Sentencing Guidelines were mandatory and that designation of a base offense level for the drug offenses in these cases would be driven by the drug quantities involved in Snyder's "relevant conduct."  The initial focus of the Court's inquiry during the plea colloquy, therefore, was to determine whether the parties had any agreement concerning drug quantities.

Although the Grand Jury charged Snyder and co-defendants in Count 1 of the Texas Indictment with conspiracy to import "one thousand kilograms or more" of "marihuana" and "five kilograms or more" of cocaine, the Plea Agreement documents referred only to cocaine.  Moreover, the December 10, 2003, plea offer that Snyder signed reflected:

> The parties stipulate and agree that for purposes of relevant conduct, *the amount of cocaine* involved in this offense [referring to Count 1 of the Indictment originally brought in Texas] *is more than one hundred and fifty kilograms which would result in a base offense level of 38.*

Emphasis added.  In addition, the April 19, 2004, Plea Agreement that Snyder also signed and that arose from the Arkansas Indictment reflected:

> The parties stipulate for relevant conduct purposes to 24 kilograms of cocaine.

The Court, therefore, inquired at the outset of the April 19, 2004, hearing whether there was any reason to retain the reference to "marihuana" in the Texas drug charge as it related to Snyder. After the government and Snyder's counsel agreed it would be appropriate to delete the marijuana references as to Snyder, the Court struck by interlineation the language "one thousand kilograms or more of a mixture or substance containing a detectable amount of marihuana, a Schedule I, Controlled Substance" from Count 1 of the Texas Indictment and confirmed this change to Snyder as follows:

> So back to what it [Count 1, as amended] says, Mr. Snyder. It's alleging, then, that you conspired, confederated and agreed with others to import into the United States from a place outside thereof controlled substances, namely five kilograms or more of a mixture or substance containing a detectable amount of cocaine.

The Court went on to ensure that Snyder understood the potential sentencing consequences arising from the allegation in the Texas charge that Snyder conspired to import five kilograms or more of a substance containing cocaine:

> THE COURT: All right. In your plea agreement, you are notified, then, that this charge carries with it a penalty of not less than ten years. That's what we call a mandatory minimum.
>
> SNYDER: Yes, ma'am.
>
> THE COURT: That's invoked by virtue of the quantity alleged in the indictment. If you didn't plead and didn't agree to certain quantities here, the Government would have to prove not only the fact that you committed the crime of conspiracy to import the drugs, but the quantity that qualifies for the mandatory

minimum.  They would have to prove that in a jury trial
beyond any reasonable doubt.  Do you understand?

SNYDER:    Yes, ma'am.

                        *  *  *

THE COURT:  So with respect to the maximum penalty and
minimum mandatory penalties, they're set out there in
paragraph 1 of your [December 10, 2003] plea agreement.
A minimum mandatory penalty of ten years in custody, a
maximum then of life . . . .

In addition, the Court informed Snyder that the same

mandatory, ten-year minimum sentence and the same maximum

sentence of life also applied to the Arkansas drug charge based

on the charged and agreed-to quantity of 24 kilograms of cocaine.

Later the Court also explained to Snyder the way drug

quantities generally affected determination of the applicable

Sentencing Guideline range:

THE COURT:  Now, the quantity of drugs in a drug crime
drives the base offense level for purposes of the
sentencing guidelines.  The guidelines determine and
increase depending upon quantities.  You understand
that?

SNYDER:    Yes, ma'am.

THE COURT:  And have you tried with Mr. Warren to go
through the sentencing . . . table and tried to get an
idea of what kind of exposure you might be facing?

SNYDER:    Yes, ma'am.

                        *  *  *

THE COURT:  . . . .  The guidelines require me to hold
you accountable for all of your conduct that is

8  –  OPINION AND ORDER

relevant to the offense of conviction, not just the
literal words charged in the indictment.  So if a
person pled guilty, for example, simply to possessing
with intent to distribute cocaine, but the facts
showed, established to the proper degree of certainty
that the person was responsible for a very large
quantity of cocaine as opposed to a small quantity, the
court could rely upon that kind of evidence and
consider as relevant conduct all of the drugs the
person possessed with intent to distribute, not just
what might have been possessed on a particular day of
an arrest charged in an indictment.

So, one, I'm required to look beyond the literal words
of the indictment to all of your relevant conduct, and
if there wasn't an agreement – but there is, as laid
out here as to quantity – I would have to make a
finding about those quantities in order to place you
properly on the guideline table.  Understand?

SNYDER:   Yes, ma'am.

THE COURT:  So in the relevant conduct paragraph [of
the December 10, 2003, plea letter], *it's indicated
that you all agree for purposes of relevant conduct the
cocaine involved in the Texas case is more than 150
kilograms, which would result in a base offense level
of 38.*  Do you understand?

SNYDER:   Yes, ma'am.

THE COURT*:  By agreeing to this quantity, Mr. Snyder,*
you're bound by it.  That means tomorrow or the next
day or at sentencing, *you cannot make an argument that
says you're accountable for less than 150 kilograms of
cocaine*.  You're signing off on this, you're agreeing
to it.  A deal's a deal.  All of it goes together.
This is something you are signing off on and will be
bound by.  Do you understand?

SNYDER:   Yes, ma'am.  Yes, ma'am.

THE COURT:  *Any hesitation there?*

9  –  OPINION AND ORDER

SNYDER:  *No, ma'am.*

Emphasis added.[1]

During the colloquy, the Court also went on to review with Snyder other Sentencing Guideline adjustments and to confirm his agreement to the factual bases for these adjustments.  For example, Snyder admitted he absconded from pretrial supervision, and, therefore, he agreed two levels for obstruction of justice should be added to the base offense level of 38 to increase it to 40.  In addition, Snyder agreed another two-level upward adjustment should be added to the base offense level because of his role as an "organizer, leader, manager or supervisor," which, in turn, increased the base offense level to 42.  The Court then explained to Snyder that the government's provisional agreement to recommend a three-level reduction for acceptance of responsibility would, if accepted by the Court, reduce the base offense level to 39, which, at Criminal History Category I, indicated a Sentencing Guideline range of 262 to 327 months.

When the Court asked Snyder whether this Sentencing

---

[1] Because this colloquy occurred before the Supreme Court's decision in *Blakely*, it was accurate at the time to inform Snyder generally that the Court had the authority to determine sentencing factors that could increase a defendant's Sentencing Guideline range.  Snyder, however, specifically agreed to all of the drug quantities that were used to determine his Sentencing Guideline range in these matters.  The Court, therefore, never had to decide contested facts for purposes of sentencing enhancements, and there was not a sentencing issue that would have been necessary to submit to a jury under *Blakely*.

Guideline range was "what he was expecting to hear," he responded, "Yes, ma'am."  Snyder also noted this meant the low end of the range effectively called for a 22-year sentence.

The Court also reviewed with Snyder his unconditional agreement to waive appeal and certain post-conviction remedies. The Court explained to Snyder the effect of these waivers:

> THE COURT:  In fact, Mr. Snyder, [the waivers mean] that on the day I sentence you and enter the judgment of your conviction, that is your last day in court on these cases and you simply will have to do the time and perform the sentence.  You won't have any relief to go up to the Ninth Circuit Court of Appeals, because you're giving up that right now.  You understand that?
>
> SNYDER:  Yes, ma'am.
>
> THE COURT:  You are giving up also the right bring a so-called habeas corpus case, a Section 2255 civil lawsuit. . . .  You're giving up your right to bring a habeas case except on three specific grounds [including] if later you determine that somehow Mr. Warren provided to you ineffective assistance of counsel . . . .
>
>                    * * *
>
> THE COURT:  . . . . So for you to bring a claim, a habeas case on ineffective assistance of counsel, you would have to show that Mr. Warren's work in this case fell below that floor, that lowest level that the Constitution would tolerate, and that it made a difference in your case.  You understand?
>
> SNYDER:  Yes, ma'am.
>
>                    * * *
>
> THE COURT:  Are you in fact satisfied with his advice and services?
>
> SNYDER:  Yes, ma'am.

THE COURT:  You hesitate.  Are you satisfied or not?

SNYDER:  Well, he just – he got pushed in a corner.  He
can only go so far, or be allowed to.  He gave me 100
percent service, yes, but he had his hands tied some.

THE COURT:  He's not a magician, he's a lawyer.

SNYDER:  I know.  I understand that.

Then the Court reviewed with Snyder the government's promise
to move for a one-level downward departure based on Snyder saving
the government significant resources by accepting the plea offers
and, therefore, permitting the government to avoid the expense,
effort, delay, and risk of trials in three judicial districts.
The Court also emphasized its ultimate discretion in determining
whether to depart.

Finally, the Court concluded Snyder was making a knowing,
intelligent, and voluntary decision to accept the government's
plea offers and to plead guilty to these three charges.  After
accepting Snyder's guilty pleas and finding him guilty of the
three charges, the Court ordered a presentence investigation
report.

**B.    The Presentence Investigation Report.**

The Presentence Investigation Report (PSR) covering these
matters was dated August 9, 2004, and submitted to the Court
and the parties in anticipation of a sentencing hearing on
September 1, 2004.  In the PSR, the following analysis was
proffered based on the 2003 edition of the United States

12 -  OPINION AND ORDER

Sentencing Guidelines Manual:

    1. <u>A Base Offense Level of 38</u>.

    With respect to the Texas and Arkansas counts of conviction, the PSR writer grouped quantities of cocaine (apparently seized in April 1996 from a driver who Snyder managed) with cocaine seized in December 2002 from Snyder's pick-up truck.  According to the PSR writer, these seizures totaled 1,068 kilograms of cocaine for a base offense level of 38 pursuant to United States Sentencing Guidelines (USSG) § 2D1.1(a)(3)(1).

    These particular quantities of cocaine were not specified in Snyder's Plea Agreements.  Nonetheless, the Plea Agreements and Snyder's statements during the plea colloquy indicated his agreement to be held accountable on the Texas drug charge for "more than one hundred and fifty kilograms" of cocaine, and this quantity "would result in a base offense level of 38."  Indeed, the Court notes USSG § 2D1.1©)(1) sets level 38 as the base offense level for "150 KG or more" of cocaine, which is the highest level referenced in this guideline.  Thus, regardless whether the agreed quantity of 24 kilograms of cocaine from the Arkansas drug charge was grouped with the "150 KG or more" of cocaine from the Texas drug charge, the base offense level for the Texas charge is 38.  Accordingly, the PSR writer's reliance on other drug quantities to support a base offense level of 38 did not have any adverse consequences for Snyder.

Finally, the PSR writer relied on USSG § 2S1.1(a)(1) to "defer" the base offense level for the money-laundering count to the underlying drug counts, effectively treating the money-laundering charge as subsumed within the base offense level for the drug charges.

Ultimately the PSR writer recommended a combined base offense level for all three charges at level 38, which was consistent with Snyder's Plea Agreements.

2.   <u>Two levels added for managerial role</u>.

Based on Snyder's written Plea Agreements and pursuant to USSG § 3B1.1, the PSR writer added two levels to level 38 to account for Snyder's managerial role.

3.   <u>Two levels added for obstruction of justice</u>.

Based on Snyder's written Plea Agreement and pursuant to USSG § 3C1.1, the PSR writer added two more levels for absconding supervision after Snyder's initial arrest and for committing the Arkansas drug crime during the period he was on abscond status.

4.   <u>Four-level acceptance-of-responsibility reduction</u>.

Based on the Plea Agreements and the affirmative recommendation of the government, and pursuant to USSG § 3E1.1, the PSR writer subtracted three levels for Snyder's acceptance of responsibility.

5.   <u>Recommended sentence of 262 months</u>.

The PSR writer noted the resulting Sentencing Guideline

range at a total offense level of 39 and with a Criminal History Category I was 262 to 327 months before departure.  The PSR writer recommended a low-end sentence of 262 months, which is the pre-departure sentence that Snyder stated he expected during the plea colloquy.

C.    **The September 1, 2004, sentencing hearing**.

As noted, the September 1, 2004, sentencing hearing in these matters occurred after the Supreme Court's decision in *Blakely* and before its decision in *Booker*.  Before the sentencing hearing, Snyder's trial counsel wrote a series of letters to the Court that called into question whether Snyder intended to stand by his Plea Agreements and his previous admissions of facts on which various Sentencing Guideline enhancements would be based. In response, the government asserted any retreat by Snyder from the terms of the Plea Agreements would relieve the government of its obligations under those Agreements, but Snyder still would be bound by his guilty pleas, which, in turn, could expose Snyder to the maximum penalty of life on each of the drug charges.

To address these concerns, the Court inquired of Snyder at the outset of the sentencing hearing:

> THE COURT:  Have you talked to Mr. Warren about what your intentions are on this subject?
>
> SNYDER:  Yes, ma'am.
>
> THE COURT:  Are you able to tell me what that is?  Do you stand by your plea agreement?

15 -  OPINION AND ORDER

SNYDER:  I made a deal, Your Honor.  I put myself at the mercy of the Court.

* * *

THE COURT:  Well, it's important that you make a very clear statement today whether you stand by --

SNYDER:  I stand by it.

THE COURT:  -- the facts in the plea agreement, or you do not.  If you don't, then I'll have to analyze what the consequences are.  If you do, then I'm going to proceed to sentencing today, taking into account the facts as you've already admitted them and hearing anything else you would like to add.  This isn't so much about mercy as it is simply about fairness and trying to follow – my trying to follow the law and apply it when the parties' points of view seem to have moved a little bit.  But I'm simply trying to confirm where you stand today, so that I can take appropriate action.

SNYDER:  I have to stand by it.

Consistent with the Plea Agreements, the government recommended a 235-month sentence to be served concurrently on each of the three charges, which took into account the one-level downward departure based on the substantial savings of judicial and governmental resources represented by the global settlement of the cases involving three judicial districts.  In addition, the government moved to dismiss all remaining pending charges. After hearing from Snyder, his counsel, and supportive family members, all of whom urged leniency, the Court imposed the 235-month concurrent sentences anticipated by the Plea Agreements and within the range dictated by the then-mandatory Sentencing Guidelines.  The Court explained the sentences to Snyder as

16 -  OPINION AND ORDER

follows:

THE COURT:  The first problem is this law that I've taken an oath to follow.  Sentencing guideline laws are being debated all around the country right now.

* * *

If you think these guidelines are too harsh, the laws need to be changed [because] I do not have the authority to wave them away.  They're there.  And, frankly, our Legislative Branch has placed a very high premium on drug crimes.  The more quantities involved, the higher the offense levels, as you've seen.

And the fact that you – you managed to bring yourself to the attention of authorities, not just in Oregon, and [that] this activity was a very serious and widespread activity put you, effectively, off the charts, from your perspective.

* * *

And if you think these consequences are dear, they would have been far worse if you had gone to trial on all of the cases and been convicted.  Now that word "if," – none of us can predict what would have happened, but it could have been far worse.  And it could have resulted in sentences arising from not just Oregon, but other jurisdictions, as well.

This is a day of great regret, I know, for you and for your family.

And there is nothing I am able to do, in the scheme of things, to soften the blow, because the law, as I'm required to apply it, calls for a sentence in the range of 235 and up.  Now, I don't see any reason to go any higher than that.

* * *

So, you know, there's no surprise here.  I'm adopting the joint recommendations that you have made. . . .

* * *

17 -  OPINION AND ORDER

> The Court has selected the low end of the guideline
> range here not just because it's the parties'
> recommendation, but because the Court is convinced the
> penalty is severe.  It is sufficient to punish the
> defendant for his behavior, to discourage others from
> engaging in this kind of behavior.  And there simply
> isn't any reason to impose any greater sentence.

**D.    Post-sentencing proceedings.**

Despite his agreement to waive appeal, Snyder filed Notices

of Appeal in each of these three cases through new counsel.  On

January 12, 2005, the Supreme Court decided *Booker*.  On January

13, 2005, the Ninth Circuit Court of Appeal dismissed Snyder's

appeals on appellate counsel's motion for voluntary dismissal.


**SUMMARY OF SNYDER'S ARGUMENTS**

In his Reply Memorandum, Snyder summarizes his claims in

these proceedings as follows:

> [I]f the Court will review Mr. Snyder's Memorandum, the
> Court will see that Mr. Snyder has two basic claims.
> First and foremost is that his trial attorney as well
> as his appellate attorney rendered constitutionally
> deficient representation.  His second claim is that
> letter's [*sic*] from the Prosecutors to his attorneys as
> well as discussion between the Prosecutors and his
> attorneys caused a breakdown in the attorney client
> relationship which caused Mr. Snyder to waive important
> rights including his appeal.
>
> The gravement [*sic*] of Mr. Snyder's Motion is that Mr.
> Warren, his attorney in this Court, and Mr. Weppener,
> his attorney in the Ninth Circuit, made errors by not
> investigating the facts and the law concerning:  (1)
> how multi-objective conspiracies were handled for
> sentencing purposes, (2) what drugs Mr. Snyder was held
> accountable under relevant conduct [*sic*], (3) which
> guideline manual should apply and how indictments
> should have been grouped under Section 3(d) of the

18 -  OPINION AND ORDER

guidelines, (4) what issues can be appealed even though
Mr. Snyder waived most of his rights to appeal, and (5)
what was the maximum exposure, under the statute and
the guidelines for each incictment [*sic*] if pled
together or separately.  These errors caused the
Defendant to be sentenced to more time in this Court
than he would have received if he would have been
sentenced in Oregon for the money launder; in Texas on
the conspiracy and in Arkansas for possession with the
intent to distribute assuming a correct calculation of
the sentencing range in each court.

In short, Snyder contends his attorneys provided ineffective
assistance when they did not advise him accurately concerning his
"correct" exposures under the statutes, Sentencing Guidelines,
and case law standards, and, as a result, Snyder allegedly
entered into Plea Agreements that wrongly called for the 235-
month sentence he now is serving.  In particular, Snyder
complains he was held accountable incorrectly because a person
convicted of a "multi-objective conspiracy" that involves more
than one controlled substance should not be held responsible for
all of the relevant conduct associated with the conspiracy.
Snyder argues he should have been exposed, in any event, only to
the maximum penalty available on the least serious object of the
conspiracy.  Snyder also asserts he was not sentenced under the
proper edition of the USSG Manual, which adversely affected the
scoring of his money-laundering crime.  In addition, Snyder
contends the two-level upward adjustment for obstruction of
justice, which arose from his having absconded pretrial
supervision and undertaken another drug crime (in Arkansas) while

19 -  OPINION AND ORDER

on release, resulted in a four-year increase in his Sentencing Guideline sentence when only a six-month sentence could have been imposed for contempt or failure to appear.  According to Snyder, therefore, his trial counsel provided ineffective assistance by wrongly steering him to agree to such an upward adjustment. Finally, Snyder contends his appellate counsel wrongly abandoned Snyder's direct appeal.

## **STANDARDS**

To prevail on his claims of inadequate assistance of counsel under *Strickland v. Washington*, Snyder must show the performance of his trial and/or appellate counsel was unreasonable under prevailing professional standards and there is a reasonable probability that "but for" any of counsel's alleged errors Snyder's sentencing outcome(s) would have been different.  *See Schardt v. Payne*, 414 F.3d 1025, 1030 (9th Cir. 2005)(citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).

## **DISCUSSION**

**A.   Snyder's trial counsel accurately informed Snyder of his exposure on the Texas drug charge.**

Although Snyder correctly argues he never admitted to the original language in the Texas Indictment charging a conspiracy to import "one thousand kilograms or more of a mixture or

substance containing a detectable amount of marihuana," he
incorrectly contends he also "pled guilty to importation of
marijuana, the second objective in the conspiracy count."  Thus,
he argues he was being sentenced for a "multi-objective
conspiracy" involving both an unproven quantity of marijuana in
addition to the quantity of cocaine to which he admitted.  Snyder
also contends the maximum penalty for the Texas charge was the
maximum penalty for an unproven quantity of a controlled
substance under 21 U.S.C. § 841(b)(1)(D) or five years.  In
short, Snyder asserts his trial counsel wrongly determined the
maximum (and, indeed, the mandatory-minimum) penalty to which the
Texas charge exposed him.  This alleged error, in turn,
purportedly led Snyder to agree to plead guilty to a level 38
drug conspiracy when, according to Snyder, he should only have
been exposed to a five-year maximum sentence on the Texas charge.

        There are many flaws with Snyder's argument.  Snyder
overlooks the fact that the parties stipulated at the change-of-
plea hearing to deletion by interlineation of all references to
marijuana from the Texas charge.  In fact, Snyder pled guilty to
the charge that, as amended, alleged only a conspiracy to import
"five kilograms or more of a mixture or substance containing a
detectable amount of cocaine."  Moreover, Snyder's Plea Agreement
and his plea colloquy with the Court confirmed his agreement that
he was accountable for "more than one hundred and fifty kilograms

21 -  OPINION AND ORDER

[of cocaine] which would result in a base offense level of 38"
for the Texas charge.  That factual foundation exposed Snyder to
a ten-year mandatory minimum sentence and a maximum sentence of
life imprisonment on the Texas charge alone.  His trial counsel,
the prosecutor, and this Court all correctly advised Snyder of
that exposure.  Similarly, Snyder was advised before his guilty
plea that the cocaine quantity to which he agreed would result in
a base offense level of 38 for the Texas charge and, ultimately,
would support a 235-month sentence.

Nonetheless, Snyder also appears to complain that the Court
wrongly held him accountable for 150 kilograms of cocaine
because, according to Snyder, that amount actually came from
cooperating witnesses whose testimony was not submitted to a
jury.  Again, Snyder's argument is without merit because he
confirmed his agreement to the 150-kilogram quantity under oath
in the course of the plea colloquy.

Moreover, the advice Snyder received concerning the minimum
and maximum penalties that he faced on the Texas charge as
amended was accurate in light of the cocaine quantities charged
in the indictment and admitted to by Snyder under oath.  Indeed,
before Snyder made the decision to accept the government's global
plea offers and to plead guilty to the Texas charge, Snyder
confirmed to the Court that he understood these exact exposures.
Thus, Snyder has failed to establish that his trial counsel

provided ineffective assistance by wrongly advising him about the maximum and mandatory-minimum penalties he faced on the Texas charge as a result of the cocaine quantities to which he agreed. Accordingly, the Court finds there is not any basis for the Court to conclude Snyder received ineffective assistance of counsel.

**B.   Use of the 2003 United States Sentencing Guidelines Manual did not result in any *ex post facto* violation.**

Snyder correctly notes his conduct underlying the Texas charge occurred between 1993 and 1999, the conduct underlying the Oregon money-laundering charge occurred in 1995, and the conduct underlying the Arkansas charge occurred in 2002.  When the Court sentenced Snyder on September 2, 2004, it relied on the 2003 United States Sentencing Guidelines Manual then in effect pursuant to USSG § 1B1.11.  Snyder, however, contends the 1995 Sentencing Guidelines Manual should have been used to calculate the sentencing guideline range for the money-laundering charge at a base offense level of 26, and, as a result, his ultimate sentence would have been less severe.

In general, a sentencing court should use the Sentencing Guidelines Manual in effect on the date a defendant is sentenced even when the court is imposing sentences for multiple offenses committed before and after various revisions to the Sentencing Guidelines Manual.  USSG § 1B1.11 b)(3) provides:

> If the defendant is convicted of two offenses, the
> first committed before, and the second after, a revised
> edition of the Guidelines Manual became effective, the

23 -  OPINION AND ORDER

revised edition of the Guidelines Manual is to be
applied to both offenses.

When literal application of § 1B1.11 would result in an *ex post
facto* violation, however, the court may apply the Sentencing
Guidelines Manual in effect at the time each offense was
committed.  *United States v. Ortland*, 109 F.3d 539, 546-47 (9th
Cir. 1997).

Snyder correctly points out that the base offense level for
money laundering under the 1995 Sentencing Guideline Manual is
26.  He contends, therefore, his proper exposure for this charge
under the 1995 Sentencing Guideline Manual after certain
adjustments was a level 24 with a Criminal History Category I,
which equals a range of 51-63 months.  The Court, however,
accepted the PSR writer's recommendation to group the money-
laundering charge with the base offense level of 38 for the drug
charges under the 2003 Sentencing Guidelines Manual.  According
to Snyder, grouping the money-laundering charge under the 2003
Sentencing Guideline Manual created an *ex post facto* violation
because the Texas drug charge allegedly carried only a five-year
maximum penalty rather than the 235-month exposure at a base
offense level of 38.

The Court already has rejected Snyder's argument that a
five-year maximum penalty applied to the Texas drug charge, and,
therefore, the Court also rejects Snyder's *ex post facto* argument
because it depends on the same flawed analysis.

24 -  OPINION AND ORDER

Nonetheless, the Court has analyzed Snyder's Sentencing Guidelines exposure under all three potentially applicable Manuals, compared the outcomes under grouping and multiple-count adjustment rules, and determined there is not any other *ex post facto* issue arising from the Court's use of the 2003 Sentencing Guidelines Manual.  In particular, even if the Court had applied a multiple-count adjustment, did not group the offenses, and used the three different Manuals, Snyder's ultimate sentencing exposure likely would have been greater than the range that actually governed his sentence.  As noted, the 1995 Sentencing Guidelines Manual calls for a base offense level of 26 for the money-laundering charge (level 23 under USSG § 2S1.1(a)(1) plus three levels under USSG § 2S1.1(b)(1)).  Under the 2003 Sentencing Guidelines Manual, the initial base offense level for the Texas drug charge was 38, which would have been increased by two levels based on Snyder's role under USSG § 3B1.1(c) and by another two levels for Snyder's obstruction of justice under USSG § 3C1.1 for a total base offense level of 42.  Under the 2002 Sentencing Guidelines Manual, the initial base offense level for the Arkansas charge based on 24 kilograms of cocaine was 34.  Applying the multiple-count adjustment under USSG § 3D1.4(a)(b) and (c), a total of one level would be added to the highest offense level of 42 for an adjusted offense level of 43 from which three levels would be subtracted for acceptance of

responsibility and an additional level subtracted based on the parties' agreed downward departure.  This would yield a final offense level of 39 with Criminal History Category 1, which is a range of 262 to 327 months.

As noted, the Court sentenced Snyder at the low end of level 38, Criminal History Category 1, which was a range of 235 to 293 months based on grouping rules under the 2003 Sentencing Guidelines Manual.  This approach, in effect, allowed both the money-laundering charge *and* the independently serious Arkansas drug charge to be subsumed in the exposure for the Texas charge. Under the circumstances, this is the most lenient application of the Sentencing Guidelines to a complex case involving multiple counts for underlying conduct that occurred under several different versions of the Sentencing Guidelines Manual. Accordingly, the Court concludes there is not any *ex post facto* violation arising from the Court's use of only the 2003 Sentencing Guidelines Manual.

The Court also finds there is not any merit to Snyder's arguments that he would have received less time if he had been sentenced for the three counts of conviction in three separate judicial districts.  To begin with, such an outcome is contrary to and would not have been possible under his global Plea Agreements.  Moreover, even if the government permitted Snyder to plead guilty only to the three charges that he ultimately

admitted and to be sentenced in three different districts, Snyder easily could have been exposed to consecutive sentences over and above a 235-month sentence that could have been attributed solely to the Texas charge, including a potential life sentence in Texas and/or Arkansas.

In summary, the Court finds there is not any basis to grant Snyder relief under § 2255 based on the Court's use of the 2003 Sentencing Guidelines Manual.

**3.    Even if Snyder's appellate counsel had secured an *Ameline* remand, Snyder's sentence would not have been materially different.**

It appears Snyder contends his appellate counsel rendered ineffective assistance when he declined to pursue a *Blakely* or *Booker* issue on appeal and instead dismissed Snyder's direct appeal in order to avoid exposing him to the government's arguments that pursuit of an appeal would violate his Plea Agreement.

The Court notes neither *Blakely* nor *Booker* apply retroactively on collateral review to convictions that became final before those cases were decided. *See Schardt v. Payne*, 414 F.3d 1025 (9th Cir. 2005)(*Blakely* does not apply retroactively on collateral review). *See also United States v. Cruz*, 423 F.3d 1119 (9th Cir. 2005)(*Booker* does not apply retroactively on collateral review).

Snyder's case was not final before *Blakely* was decided.

27 -  OPINION AND ORDER

Even if it had been, however, Snyder admitted all of the drug quantities that served to enhance his guidelines exposure.  Thus, there is not any *Blakely* error that could have been addressed on direct appeal.  Accordingly, there is not any basis for the Court to provide § 2255 relief to Snyder because his appellate counsel declined to prosecute a *Blakely* appeal.

On the other hand, Snyder's case still was on direct review when *Booker* was decided because Snyder's appellate counsel did not dismiss the appeal until the next day.  Thus, § 2255 relief might be available to Snyder for any *Booker* error.

According to Snyder, appellate counsel rendered ineffective assistance when he dismissed Snyder's appeal, which, in turn, precluded any direct review of his sentence under advisory Sentencing Guidelines and post-*Booker* standards.  In particular, Snyder contends this Court might have exercised discretion to impose a more lenient sentence despite the terms of the Plea Agreements if the Court had been free to treat the Sentencing Guidelines as advisory.

In the Ninth Circuit, this type of problem has been addressed on direct review by what has been termed an "*Ameline* limited remand" procedure.  *See United States v. Moreno-Hernandez*, 419 F.3d 906, 916 (9th Cir. 2005).  When a defendant was sentenced under the then-mandatory Sentencing Guidelines and the Ninth Circuit cannot reliably determine from the record

whether the sentence imposed would have been materially different if the sentencing court had known the Sentencing Guidelines were merely advisory, the appellate court has remanded the matter to the sentencing court to answer that question and, when appropriate, to resentence the defendant pursuant to *United States v. Ameline*, 409 F.3d 1073, 1084 (9th Cir. 2005)(*en banc*). *See United States v. Moreno-Hernandez*, 419 F.3d at 916 (extending *Ameline*'s limited remand procedure to cases involving nonconstitutional error under *Booker*).

If Snyder's appellate counsel had raised a *Booker/Ameline* issue on direct appeal, this Court concludes the Ninth Circuit likely would have remanded Snyder's case to this Court to determine whether the sentence imposed would have been materially different if the Court had known the Sentencing Guidelines were advisory.  Without deciding whether, as the government argues, Snyder's appeal-waiver extended to a *Booker/Ameline* issue, this Court has undertaken a "second look" at the sentencing record in these cases to determine whether, under the second *Strickland* prong, there is any basis to conclude Snyder was prejudiced by the dismissal of his direct appeal and the resulting absence of any *Ameline* remand.

In a thorough review of the record, the Court has considered all of the undisputed facts.  The Court notes most of the facts weigh in favor of a severe sentence:  specifically, the nature

and seriousness of each of Snyder's admitted offenses, the gravity of Snyder's conduct in resuming his illegal drug activity in another judicial district while on pretrial release in this District, the sheer volume of cocaine for which he admitted responsibility, and the years over which his criminal behavior persisted.  The Court also notes there are mitigating factors, including Snyder's youth and the fact that these criminal episodes (although serious and longstanding) were Snyder's first offenses.  In addition, the Court has considered all of the sentencing factors set out in 18 U.S.C. § 3553(a) to determine a reasonable sentence.

On balance, and in the exercise of its discretion, the Court concludes a 235-month concurrent sentence on each of the three counts of conviction is reasonable both under the Sentencing Guidelines and all of the factors under 18 USC § 3553(a).  Thus, the Court finds it would not have imposed a materially different sentence if the Ninth Circuit had remanded Snyder's case to this Court on direct appeal for a limited *Ameline* remand.

Accordingly, the Court finds Snyder's sentencing outcomes would not have been different, and, therefore, there is not any basis under *Strickland* to grant Snyder § 2255 relief on the basis that his appellate counsel did not facilitate Snyder's direct appeal.

**CONCLUSION**

For these reasons, the Court concludes there is not any need for an evidentiary hearing nor a basis to provide relief to Defendant Snyder on his Amended Motions to Vacate or to Correct Sentence Under § 2255 (#23) in CR 04-115-BR (CV 05-1093-BR), (#65) in CR 00-371-BR (CV 05-1094-BR), and (#65) in CR 00-547-BR (CV 05-1095-BR).

Accordingly, the Court **DENIES** each of the Amended Motions in each of the enumerated cases and **DISMISSES** each of these matters **with prejudice.**

IT IS SO ORDERED.

DATED this 29th day of March, 2006.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


31 - OPINION AND ORDER